```
___ FILED    X LODGED
___ RECEIVED ___ COPY

    OCT 1 0 2022

CLERK U S DISTRICT COURT
  DISTRICT OF ARIZONA
BY_____ DEPUTY
```

1 GARY M. RESTAINO
United States Attorney
2 District of Arizona

3 MARIA R. GUTIERREZ
Arizona State Bar No. 026659
4 MARK J. WENKER
Arizona State Bar No. 018187
5 BRUCE R. VAN BAREN
Illinois State Bar No. 6310375
6 Assistant U.S. Attorneys
Two Renaissance Square
7 40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
8 Telephone: 602-514-7500
Email: maria.gutierrez@usdoj.gov
9 Email: mark.wenker@usdoj.gov
Email: bruce.van.baren@usdoj.gov
10 Attorneys for Plaintiff

11              IN THE UNITED STATES DISTRICT COURT

12                 FOR THE DISTRICT OF ARIZONA

13 United States of America,

14              Plaintiff,

15    v.                                    CV-22-612-PHX-DLR

16 1. Entire Balance In Metropolitan
   Commercial Bank Account Number      **VERIFIED COMPLAINT FOR**
17 XXXXXX6600 Held in the Name of         **FORFEITURE *IN REM***
   "BIGBEN1613 LLC DBA CORNER
18 STONE GROUP DBA NEKTOVA,"                **(Under Seal)**

19 2. Entire Balance in Metropolitan       **(Jury Trial Demanded)**
   Commercia Bank Account Number
20 XXXXXX6570 Held in the Name of
   "BIGBEN1613 LLC DBA CORNER
21 STONE GROUP DBA NEKTOVA,"

22           Defendants *In Rem.*

23        Plaintiff United States of America ("United States") brings this Complaint and

24 alleges pursuant to Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules

25 for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

26                    **NATURE OF THE ACTION**

27        1.    This is a civil action *in rem* to forfeit the defendant property, a total of at least

28 $3,126,862.01 in United States currency, to the United States pursuant to 18 U.S.C.

§§ 981(a)(1)(A) and 984 because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (Money Laundering) and 18 U.S.C. § 1960 (Unlicensed Money Transmitting Business), or traceable to such property.

## JURISDICTION AND VENUE

2.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1345 because the United States commenced this civil action as authorized by 18 U.S.C. §§ 981(a)(1)(A) and 984 and pursuant to 28 U.S.C. § 1355(a) because this action seeks forfeiture of the defendant property.

3.      This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) and (d) because acts or omissions giving rise to this forfeiture action occurred in the District of Arizona.

4.      This Court has venue pursuant to 18 U.S.C. § 981(h) and 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to this forfeiture action occurred in the District of Arizona.

## DEFENDANTS *IN REM*

5.      The defendant property consists of at least $3,126,862.01 in United States currency in Metropolitan Commercial Bank ("Metropolitan") Account Numbers XXXXXX660 ("Account 1") and XXXXXX6570 ("Account 2"), both of which are held in the name of "BIGBEN1613 LLC DBA CORNER STONE GROUP DBA NEKTOVA" ("Defendant Property").

6.      Metropolitan is a New York-based and New York-chartered bank with its headquarters located at 99 Park Avenue, 12th Floor, New York, New York 10016.

7.      BigBen1613 L.L.C. ("BigBen1613") is a Florida manager-managed limited liability company with its principal place of business located at 508 NE 190th St, Miami, Florida 33179. According to the Operating Agreement of BigBen1613, Benjamin Winkler ("Winkler") and Moshe Cohen ("Cohen") are the sole members of BigBen1613. Winkler

holds a 90% interest, and Cohen holds a 10% interest. Both Winkler and Cohen are managers. Winkler resides in Florida. Cohen resides in New York.

8.    On March 21, 2022, the Hon. Eileen S. Willett, U.S. Magistrate Judge for the District of Arizona, issued a "Warrant to Seize Property Subject to Forfeiture" ("Seizure Warrant") for "the Entire Balance In and Any and All Subsequent Deposits, Transfers, and Payments Into and Out of Metropolitan Commercial Bank Account Numbers ▮▮▮▮660 and ▮▮▮▮6570 Held in the Name of 'BIGBEN1613 LCC DBA CORNER STONE GROUP DBA NEKTOVA,' commencing on the date of this warrant and continuing for a period of 14 days." The deadline for execution of the Seizure Warrant was April 4, 2022.

9.    On March 24, 2022, Department of Homeland Security, Immigration Customs and Enforcement, Homeland Security Investigations ("HSI") Special Agent Roberto P. Lucchesi ("Lucchesi") served the Seizure Warrant on Metropolitan.

10.    Metropolitan confirmed receipt of the Seizure Warrant and advised Lucchesi that at the time, $0 was in Account 1 and $2,843,248.01 was in Account 2—a total of $2,843,248.01. Metropolitan further confirmed that Accounts 1 and 2 would "dammed" such that funds could be transferred into Accounts 1 and 2 but no funds could be transferred out of Accounts 1 and 2. Around the close of business that same day, Metropolitan advised $183,614 was in Account 1 and $2,943,248.01 was in Account 2—a total of $3,126,862.01.

11.    On March 30, 2022, Lucchesi requested that Metropolitan process the seizure and provided the name and address to which it could direct the Defendant Property.

12.    On March 30, 2022, outside counsel for Metropolitan sent Lucchesi a letter stating that Metropolitan's position is that the Seizure Warrant should be released because it is a secured creditor that has a perfected security interest in Accounts 1 and 2.

13.    On April 4, 2022, Metropolitan responded to Lucchesi's request that Metropolitan process the seizure and directed Lucchesi to its outside counsel.

14.    On April 11, 2022, outside counsel for Metropolitan advised the undersigned Assistant United States Attorney from the U.S. Attorney's Office for the District of Arizona

- 3 -

1     that Metropolitan's position was that the United States had not effectuated the seizure

2     because it had not provided a notice of seizure and therefore would not transfer the funds

3     in Account 1 and 2 to HSI as requested pursuant to the Seizure Warrant.

4           15.     On April 13, 2022, the undersigned Assistant United States Attorney advised

5     outside counsel for Metropolitan that there was no such requirement that a notice of seizure

6     be served to effectuate the seizure and asked Metropolitan if it would transfer the funds to

7     HSI as requested pursuant to the Seizure Warrant. As of this filing, it has not done so.

8           16.     As such, the Defendant Property is currently in the custody of Metropolitan

9     in New York. Therefore, if additional meet and confer efforts are unsuccessful, the United

10    States anticipates filing a motion to compel compliance with the Seizure Warrant.

11 **FACTUAL BACKGROUND**

12 **A.     Overview of United States' Investigation of Mexico-Based Money Brokers**

13           17.     HSI has been targeting Mexico-based money brokers ("Mexico money

14    brokers") who are using shell companies or actual businesses and the associated bank

15    accounts to move proceeds from the United States to Mexico and other countries for drug-

16    trafficking organizations operating in the United States.

17           18.     Starting in September 2020, confidential sources and others have introduced

18    a Phoenix-based undercover ("UC") to several Mexico money brokers. The UC pretends

19    to be a Phoenix-based money broker with a network of associates throughout the United

20    States. The UC tells the Mexico money brokers that the UC can facilitate the collection of

21    cash in cities in the United States and facilitate the payout of that cash in Mexico and other

22    countries in exchange for a fee.

23           19.     Generally, after the UC is introduced to a Mexico money broker, the UC will

24    engage in a series of communications with that individual. The initial communications

25    typically consist of discussions regarding the pick-up of bulk cash in the United States and

26    the payout of that cash in United States dollars in Mexico and other countries. Usually, the

27    UC explains that the UC has associates in certain cities throughout the United States and

28

that the UC's associates can conduct money pickups in those locations. The Mexico money broker will generally respond by discussing the services that they provide, including generating money pickup contracts in the Unites States and/or paying out cash in Mexico and/or other countries.

20.    In turn, the Mexico money brokers usually ask the UC for some form of the following information:  1) the locations in the United States where the UC can conduct money pickups; 2) how the UC pays out in Mexico or in another country the cash that was picked up in the United States; 3) fees that the UC charges for the UC's services; 4) how long it will take for the UC to payout the money that was picked up; and 5) the risk and safety of the UC's pickup and payout operations.

21.    The UC will then explain to the Mexico money brokers that the UC has backstopped business bank accounts, which can handle large cash deposits without raising suspicion from regulators and/or law enforcement.  The UC will also explain that the UC deposits the cash from the pickups into these bank accounts and then wires the funds to other United States-based bank accounts that are controlled by either the Mexico money broker or other individuals who are able to payout the cash in Mexico or other countries. The UC avoids making direct wire transfers into the Mexico-based bank accounts of the Mexico money brokers by claiming that these types of direct transfers attract the attention of regulators and/or law enforcement.   The UC and the Mexico money broker will sometimes also discuss using techniques such as fake invoices in order to make an illegal transaction appear legitimate.

22.    Often, the Mexico money brokers want to know how the money pickup in the United States will be conducted and how the payout will take place in the foreign country.

23.    The typical money pickup usually proceeds as follows:

a.   A Mexico money broker will contact the UC regarding a potential cash pickup in the United States, which needs to be paid out in Mexico or elsewhere.

b.   If the pickup is feasible, the UC and the Mexico money broker then agree on a pickup fee (paid to the UC) and the payout method and location.

c.   After agreeing on a pickup fee and payout method, the UC sends the Mexico money broker an image of a United States dollar bill showing the serial number ("the series"), the telephone number for an "associate" (who is the UC or another undercover) in the city where the pickup will take place, and the password or passphrase that the Mexico money broker will need to provide when calling the pickup's point of contact.

d.   After the UC provides a series, the contact number for the associate who is picking up the money, and the password or the passphrase, the Mexico money broker forwards this information to his/her client.  Generally, the Mexico money broker's client ("the client")—often a member of a drug trafficking organization operating in the United States—is the ultimate owner of the cash that is going to be picked up in the United States and paid out in Mexico or elsewhere.

e.   The client will then forward the same information to individual(s) in the United States who will be delivering the cash to the associate.

f.   Once the pickup is ready, the individual(s) working on behalf of the Mexico money broker's client(s) will call the associate to coordinate a time and location for the delivery of the cash.  Pickup locations typically include parking lots adjacent to malls, gas stations, and grocery stores.  But if the delivery involves large amounts of cash, the pickups generally occur inside of hotel lobbies or other similar locations.

g.  Upon meeting for delivery, the UC or the UC's associate will provide the dollar bill with the series that was provided to the Mexico money broker. The presentation of the dollar bill confirms to the individual(s) delivering the cash that they are dealing with the people to whom the cash should be released and further serves as a receipt to show that the cash was in fact delivered.

h.  Once the pickup occurs, the UC then informs the Mexico money broker that the pickup was successful. At this point, the Mexico money brokers regularly want the UC to confirm the amount that was picked up. The UC generally confirms the pickup amount by sending an image of the deposit slip, which shows the amount of cash deposited into the respective bank account(s) (undercover bank accounts in Arizona). The amount of cash deposited is usually the cash that was picked up.

i.  Finally, the UC and the Mexico money broker must determine how the cash will actually be paid out to the Mexico money broker. If the Mexico money broker has access to a United States-based bank account, the UC will wire the funds to that account and will forward a screenshot proving that the funds were wired. At this point, the UC's "pick-up" contract is complete. This is the routine scenario as the Mexico money brokers generally provide the UC with United States-based bank accounts for shell companies or actual businesses involved in money laundering. But if the requesting Mexico money broker does not have access to a United States-based bank account, the UC must coordinate with individuals who have access to a United States-based bank account *and* access to cash in Mexico—or another foreign country—to make final delivery of the cash. In this alternative scenario, the UC wires the funds to that individual's United States-based account and that individual then makes final delivery of the cash in Mexico or elsewhere.

- 7 -

24.    The Mexico money brokers commonly use the same coded terms in Spanish to refer to cities/locations in the Unites States and in other countries. The following are common examples: 1) New York City = *Las Torres* (the towers); 2) Chicago = *Los Vientos* (the wind); 3) Miami = *La Playa* (the beach); 4) Culiacan, Sinaloa, Mexico = *El Rancho* (the ranch); 5) Mexico City = *El Humo* (the smoke).

**B.    Summary of UC's Communications with Mexico-Based Money Broker 1**

25.    On October 29, 2020, the UC spoke with an individual who was introduced to him as Mexico-based money broker ("Mexico Money Broker 1") over WhatsApp. The following is a summary of the UC's initial call with Mexico Money Broker 1; it is not verbatim. The UC began by stating that the UC was in Phoenix and that the UC had "associates" throughout the United States who pick up money. The UC added that the UC works with "well-armored" (backstopped) accounts. The UC then said that the UC avoids sending direct wires into Mexico-based bank accounts. Instead, the UC explained that the UC has "friends" in Mexico City and Monterrey who provide the UC with United States-based bank accounts in exchange for cash payouts in "the smoke" (i.e., Mexico City). The UC added that, more recently, "certain clients" have been requesting payouts in the "the ranch" (i.e., Culiacan) and Hermosillo, Sonora, Mexico, but that the UC did not have associates who could payout in those cities. Mexico Money Broker 1 acknowledged and confirmed that he had "green ones" (i.e., United States dollars) available for payouts. Mexico Money Broker 1 added that he could pay out dollars in Monterrey for a "small percentage fee." The UC then explained that the UC can assist Mexico Money Broker 1 if he has clients who need cash picked up in the United States. The UC said that the UC's fee is about "1.5 percent of the funds that are going to be deposited and transferred" in the United States. But if the funds need to be paid out in Mexico, then the "fee is about three percent." The UC explained that the UC prefers pickups in Phoenix since the UC is in Phoenix. Mexico Money Broker 1 acknowledged and said that he has clients in Phoenix and Tucson. Mexico Money Broker 1 said that those "contracts are not big" and the

1    contracts are infrequent, but he would let the UC know if the contracts come up. Mexico

2    Money Broker 1 said that he usually pays about two to 2.5 percent for money pickups in

3    Phoenix. For money pickups in cities like "the towers" (i.e., New York), he usually pays

4    about 6.5 percent. Finally, Mexico Money Broker 1 said that he has a lot of "movement"

5    (i.e., money pickups) and clients and would contact the UC after speaking with his clients.

6    　　　　26.　　Since then, Mexico Money Broker 1 has offered, and the UC has accepted,

7    multiple money pickup contracts. While some of these money pickup contracts were

8    completed (i.e., the UC, or an "associate" who was another undercover special agent,

9    conducted the money pickup, deposited the bulk cash into the undercover law enforcement

10   bank account, domestically wired the funds to a business bank account as directed by

11   Mexico Money Broker 1, and the funds were ultimately paid out to Mexico Money Broker

12   1's clients in Mexico or other countries), several other money pickup contracts were

13   interdicted by law enforcement before they were completed. After these interdictions,

14   Mexico Money Broker 1 did not contact the UC to express surprise that law enforcement

15   would seize these funds or that he or his client would contest the seizure of the funds.

16   　　　　27.　　On February 11, 2021, a few hours after law enforcement seized $150,000 in

17   Los Angeles, California, the UC spoke with Mexico Money Broker 1 over WhatsApp. The

18   following is a summary of the UC's call with Mexico Money Broker 1; it is not verbatim.

19   Mexico Money Broker 1 began the conversation by saying that he "already sent it" (i.e.,

20   the phone number and series for a money pickup contract) and that the money courier was

21   ready. The UC then asked Mexico Money Broker 1 if he heard anything from Los Angeles

22   (i.e., referring to a different money pickup contract he had accepted from Mexico Money

23   Broker 1). Mexico Money Broker 1 stated that it was weird there (i.e., Los Angeles)

24   because the money courier didn't answer his phone and he works nights. Mexico Money

25   Broker 1 further stated that a lot of the times the money courier gets off work at 11 p.m.,

26   so then he falls asleep until the following afternoon, wakes up, and then that's it. But if he

27   had an appointment, that's what we think is weird because the money courier usually

28

1    organizes himself and does everything before going to sleep. Mexico Money Broker 1
2    stated he didn't know if there was already an appointment scheduled for today. The UC
3    confirmed that the meet was scheduled for 12 p.m.  The UC further stated that if they don't
4    receive a call from the money courier, then they will just cancel the money pickup contract.
5    Mexico Money Broker 1 agreed and confirmed that he was waiting for the money courier
6    to report back as he was not answering his phone. Mexico Money Broker 1 believed that
7    the money courier was sleeping. Mexico Money Broker 1 further stated that when the
8    money courier wakes up, he will see what happened. Mexico Money Broker 1 never
9    reached out to the UC to explain that law enforcement seized $150,000 from the money
10   courier, which was likely the reason he was not answering Mexico Money Broker 1.

11       28.    On August 17, 2021, the UC spoke with Mexico Money Broker 1 over
12   WhatsApp. The following is a summary of the UC's call with Mexico Money Broker 1; it
13   is not verbatim. Mexico Money Broker 1 inquired about the UC's ability to conduct
14   additional money pickups in Seattle. The UC advised Mexico Money Broker 1 that he
15   could support additional pickups in Seattle but that the courier who delivered the funds for
16   the April 19, 2021, money pickup in Seattle was discussing drugs with his "associate"
17   (another HSI undercover special agent) during the money pickup, which the UC didn't like.
18   Mexico Money Broker 1 advised that there would be a new courier for future pickups.

19       29.    On January 7, 2022, the UC spoke with Mexico Money Broker 1 over
20   WhatsApp. The following is a summary of the UC's call with Mexico Money Broker 1; it
21   is not verbatim.  Mexico Money Broker 1 advised the UC that things have been "calm"
22   (i.e., Mexico Money Broker 1 had not been requesting the UC's money pickup services in
23   the United States) because Mexico Money Broker 1 had established his own "real nice
24   structure" that gives him "a little control of all the transfers" (i.e., his own money pickup
25   operation in the United States) in September 2021.  Mexico Money Broker 1 advised the
26   UC that he can now conduct money pickups in "almost all" cities in the United States and
27   noted that some of his couriers operate like flight attendants:  they "travel[]," "collect[],"

28

- 10 -

"deposit," and "leave." Mexico Money Broker 1 also explained that he had found a contact with an office and accounts in Miami "that can hold a big amount" and convert to cryptocurrency once deposited. Mexico Money Broker 1 and the UC further discussed their respective operations, including the difficulty of depositing bulk cash into U.S. bank accounts, the benefit of transferring funds to bank accounts tied to companies that export merchandize such as perfume or phones to other countries, and how to purchase cryptocurrency at a discount in one location and sell it at a premium in another location. Mexico Money Broker 1 and the UC discussed how they could help each other in the future with Mexico Money Broker 1 offering to, in exchange for a fee, convert the UC's cryptocurrency to cash that the UC could then use to pay out in Mexico.

**C.    Ten UC Money Pickups in Chicago, Houston, Phoenix, and Seattle Wired to Accounts 1 and 2 throughout 2021 as Instructed by Mexico Money Broker 1.**

30.    From at least on or about April 14, 2021, through on or about August 23, 2021, the UC accepted at least seven U.S.-based money pickup contracts from Mexico Money Broker 1 in which Mexico Money Broker 1 instructed the UC to deposit the funds into Account 1. Generally, the transactions worked as follows:  Mexico Money Broker 1 reached out to the UC and offered a money pickup contract of a specific amount in a general geographical location in the United States. The UC agreed to coordinate the pickup of bulk cash and launder it in exchange for a fee of 1.5%. Mexico Money Broker 1 identified the bank accounts to which the UC was to wire the amounts picked up (less the UC's 1.5% fee). For each transaction, the UC coordinated with various HSI offices to pick up the bulk currency on behalf of Mexico Money Broker 1.  Once the bulk currency was picked up, the funds were deposited into the undercover account and then wired to Account 1 as instructed by Mexico Money Broker 1. Following these wire transfers to Account 1, bank records show nearly all of the funds were wired to Account 2 the same day.

31.    On at least three other occasions during this same period, the UC contacted Mexico Money Broker 1 regarding paying out in Mexico the bulk cash picked up in the United States on behalf of other money brokers' clients. Mexico Money Broker 1 charged

- 11 -

a 1.5% fee to pay out the bulk cash picked up in the United States to the clients of the other money brokers. Once the bulk cash was picked up, the funds were deposited into the undercover account and wired to Account 1, as instructed by Mexico Money Broker 1. Following these wire transfers to Account 1, nearly all of the funds were wired to Account 2 the same day. The funds were ultimately paid out in Mexico to the clients of the other money brokers. The amounts reflected the deduction of Mexico Money Broker 1's fee.

1.    UC Money Pickup 1 on April 14, 2021, in Phoenix

32.    On or about April 13, 2021, Mexico Money Broker 1 reached out to the UC and offered a money pickup contract of $200,000 in Phoenix, Arizona.   The UC agreed to coordinate the pickup of bulk U.S. currency and launder it for a fee of 1.5%.

33.    On or about April 14, 2021, HSI Phoenix picked up $199,930 in Phoenix, Arizona on behalf of Mexico Money Broker 1 and their client(s).

34.    Following the pickup, the funds were deposited into an account at Bank of America, N.A. held in the name of a Wyoming-based limited liability company ("UC Company"), which was controlled by law enforcement ("UC Account").

35.    Following the deposit, based on instructions from Mexico Money Broker 1, the UC sent a $191,391.05 wire to Account 1 and a $6,000 wire to a bank account held by a different company. The two wires reflected the total amount of funds that Mexico Money Broker 1 and the UC agreed to launder minus the commission paid to the UC.

36.    Following the wire to Account 1, nearly all of the funds were wired to Account 2 the same day. At the time, there were other funds in Accounts 1 and 2.

2.    UC Money Pickup 2 on April 19, 2021, in Seattle

37.    On or about April 12, 2021, Mexico Money Broker 1 reached out the UC and offered a money pickup contract of $185,000 in Seattle, Washington. The UC agreed to coordinate the pickup of the bulk U.S. currency and launder it in exchange for a fee.

38.    On or about April 19, 2021, HSI Seattle picked up $149,600 in the Seattle area on behalf of Mexico Money Broker 1 and their client(s).

39.   Following the pickup, the funds were deposited into the UC Account.

40.   Following the deposit, based on instructions from Mexico Money Broker 1, the UC sent a $147,326 wire to Account 1. The wire reflected the total amount Mexico Money Broker 1 and the UC agreed to launder minus the commission paid to the UC.

41.   Following the wire to Account 1, nearly all of the funds were wired to Account 2 the same day. At the time, there were other funds in Accounts 1 and 2.

3.   UC Money Pickup 3 on April 29, 2021, in Chicago

42.   On or around April 28, 2021, Mexico Money Broker 1 reached out to the UC and offered a money pickup contract of $200,000 in Chicago, Illinois. The UC agreed to coordinate the pickup of the bulk U.S. currency and launder it in exchange for a fee.

43.   On or around April 29, 2021, HSI Chicago conducted a money pick-up of $199,900 in the Chicago area on behalf of Mexico Money Broker 1 and their client(s).

44.   Following the pickup, the funds were deposited into the UC Account.

45.   Following the deposit, based on instructions from Mexico Money Broker 1, the UC sent a $196,871.50 wire to Account 1. The wire reflected the total amount Mexico Money Broker 1 and the UC agreed to launder minus the commission paid to the UC.

46.   Following the wire to Account 1, nearly all of the funds were wired to Account 2 the same day. At the time, there were other funds in Accounts 1 and 2.

4.   UC Money Pickup 4 on May 13, 2021, in Seattle

47.   On or around May 11, 2021, Mexico Money Broker 1 reached out to the UC and offered a money pickup contract of $120,000 in Seattle, Washington. The UC agreed to coordinate the pickup of the bulk U.S. currency and launder it in exchange for a fee.

48.   On or around May 13, 2021, HSI Seattle conducted a money pick-up of $150,040 in the Seattle area on behalf of Mexico Money Broker 1 and their client(s).

49.   Following the pickup, the funds were deposited into the UC Account.

50.     Following the deposit, based on instructions from Mexico Money Broker 1, the UC sent a $147,759.40 wire to Account 1.  The wire reflected the total amount Mexico Money Broker 1 and the UC agreed to launder minus the commission paid to the UC.

51.     Following the wire to Account 1, nearly all of the funds were wired to Account 2 the same day. At the time, there were other funds in Account 2.

5.     UC Money Pickup 5 on June 23, 2021, in Chicago

52.     On or around June 18, 2021, a second Mexico money broker ("Mexico Money Broker 2") offered to the UC a money pickup contract of $200,000 in Chicago, Illinois.  The UC agreed to coordinate the pickup of the bulk U.S. currency and coordinate the pay out of the funds in Mexico in exchange for a fee.

53.     On or around June 23, 2021, HSI Chicago conducted a money pick-up of $199,980 in the Chicago area on behalf of Mexico Money Broker 2 and their client(s).

54.     Following the pickup, the funds were deposited into the UC Account.

55.     The UC separately contacted Mexico Money Broker 1 regarding paying out the funds in Mexico, and they agreed to pay out the funds in Mexico in exchange for a fee.

56.     Following the deposit into the UC Account, based on instructions from Mexico Money Broker 1, the UC sent a $98,460.15 wire to Account 1 and a $98,460.15 wire to a bank account held by a different company. The two wires reflected the total amount of funds Mexico Money Broker 2 requested to be laundered minus the commission paid to the UC.  A total amount of $185,921.40 was ultimately paid out in Mexico.  That amount reflected the deduction of the fee that Mexico Money Broker 1 charged.

57.     Following the wire to Account 1, nearly all of the funds were wired to Account 2 the same day. At the time, there were other funds in Accounts 1 and 2.

6.     UC Money Pickup 6 on June 29, 2021, in Phoenix

58.     On or around June 24, 2021, Mexico Money Broker 1 reached out to the UC and offered a money pickup contract of $100,000 in Phoenix, Arizona.  The UC agreed to coordinate the pickup of the bulk U.S. currency and launder it in exchange for a fee.

- 14 -

59.    On or around June 29, 2021, HSI Phoenix conducted a money pick-up of $150,000 in the Phoenix area on behalf of Mexico Money Broker 1 and their client(s).

60.    Following the pickup, the funds were deposited into the UC Account.

61.    Following the deposit, based on instructions from Mexico Money Broker 1, the UC sent a $100,000 wire to Account 1 and a $47,690 wire to a bank account held by a different company.  The two wires reflected the total amount of funds that Mexico Money Broker 1 and the UC agreed to launder minus the commission paid to the UC.

62.    Following the wire to Account 1, nearly all of the funds were wired to Account 2 the same day. At the time, there were other funds in Accounts 1 and 2.

7.    <u>UC Money Pickup 7 on July 8, 2021, in Phoenix</u>

63.    On or around July 6, 2021, a Phoenix-based money broker ("Phoenix Money Broker 1"), reached out to the UC and offered a money pickup contract of $50,000 in Phoenix, Arizona.  The UC agreed to coordinate the pickup of bulk U.S. currency and coordinate the pay out of the funds in Mexico in exchange for a fee.

64.    On or around July 8, 2021, HSI Phoenix conducted a money pick-up of $49,000 in the Phoenix area on behalf of Phoenix Money Broker 1.

65.    Following the pickup, the funds were deposited into the UC Account.

66.    The UC separately contacted Mexico Money Broker 1 regarding paying out the funds in Mexico, and they agreed to pay out the funds in Mexico in exchange for a fee.

67.    Following the deposit, based on instructions from Mexico Money Broker 1, the UC sent a $48,235 wire to Account 1.  The wire reflected the total amount of funds that Phoenix Money Broker 1 requested to be laundered minus the commission paid to the UC.

68.    Following the wire to Account 1, nearly all of the funds were wired to Account 2 the same day. At the time, there were other funds in Accounts 1 and 2.

69.    A total amount of $47,500 was ultimately paid out in Mexico.  That amount reflected the deduction of the fee that Mexico Money Broker 1 charged.

- 15 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**8.    UC Money Pickup 8 on July 15, 2021, in Phoenix**

70.    On or around July 12, 2021, Mexico Money Broker 1 reached out to the UC and offered a money pickup contract of $150,000 USC in Phoenix, Arizona.  The UC agreed to coordinate the pickup of bulk U.S. currency and launder it in exchange for a fee.

71.    On or around July 15, 2021, HSI Phoenix conducted a money pick-up of $100,000 in the Phoenix area on behalf of Mexico Money Broker 1 and their client(s).

72.    Following the pickup, the funds were deposited into the UC Account.

73.    Following the deposit, based on instructions from Mexico Money Broker 1, the UC sent a $98,470 wire to Account 1.  The wire reflected the total amount Mexico Money Broker 1 and the UC agreed to launder minus the commission paid to the UC.

74.    Following the wire to Account 1, nearly all of the funds were wired from Account 2 the same day. At the time, there were other funds in Accounts 1 and 2.

**9.    UC Money Pickup 9 on July 27, 2021, in Phoenix**

75.    On or around July 26, 2021, Mexico Money Broker 1 reached out to the UC and offered a money pickup contract of $100,000 USC in Phoenix, Arizona.  The UC agreed to coordinate the pickup of bulk U.S. currency and launder it in exchange for a fee.

76.    On or around July 27, 2021, HSI Phoenix conducted a money pick-up of $100,020 in the Phoenix area on behalf of Mexico Money Broker 1 and their client(s).

77.    Following the pickup, the funds were deposited into the UC Account.

78.    Following the deposit, based on instructions from Mexico Money Broker 1, the UC sent a $98,489.70 wire to Account 1.  The wire reflected the total amount Mexico Money Broker 1 and the UC agreed to launder minus the commission paid to the UC.

79.    Following the wire to Account 1, nearly all of the funds were wired to Account 2. At the time, there were other funds in Accounts 1 and 2.

**10.    UC Money Pickup 10 on August 24, 2021, in Houston**

80.    On or around August 23, 2021, a third Mexico money broker ("Mexico Money Broker 3"), offered to the UC a money pickup contract of $85,000 in Houston,

- 16 -

Texas. The UC agreed to coordinate the pickup of the bulk U.S. currency and coordinate the pay out of the funds in Mexico in exchange for a fee.

81.    On or around August 24, 2021, HSI Houston conducted a money pick-up of $99,990 in the Chicago area on behalf of Mexico Money Broker 3 and their client(s).

82.    Following the pickup, the funds were deposited into the UC Account.

83.    The UC separately contacted Mexico Money Broker 1 regarding paying out the funds in Mexico, and they agreed to pay out the funds in Mexico in exchange for a fee.

84.    Following the deposit into the UC Account, based on instructions from Mexico Money Broker 1, the UC sent $49,245.07 wire to Account 1 and a $49,245.08 wire to a bank account held by a different company. The two wires reflected the total amount Mexico Money Broker 3 requested to be laundered minus the commission paid to the UC. A total amount of $96,990.30 was ultimately paid out in Mexico. That amount reflected the deduction of the fee that Mexico Money Broker 1 charged.

85.    Following the wire to Account 1, nearly all of the funds were wired to Account 2 the same day. At the time, there were other funds in Accounts 1 and 2.

**D.    Seizure of Controlled Substances from Courier in UC Money Pickups 2 and 4.**

86.    During UC Money Pickup 2 on or around April 19, 2021, in Seattle, HSI Seattle identified the courier ("Seattle Courier 1") to whom they showed the series and who dropped off $149,600 based on his Washington Driver's License photograph. During UC Money Pickup 4 on or around May 13, 2021, in Seattle, HSI Seattle identified Seattle Courier 1 as the one to whom they showed the series and who dropped off $150,040.

87.    Seattle Courier 1 advised HSI Seattle that his friend sells "fentanyl" pills. HSI Seattle advised Seattle Courier 1 that they smuggle "white" (i.e., cocaine) to Canada and could distribute kilograms of cocaine at $28,000 per kilogram. Seattle Courier 1 advised HSI Seattle that his friend would be interested in buying kilograms of cocaine.

88.    On or around August 25, 2021, Seattle HSI paid Seattle Courier 1 $2,000 for 72.4 grams of counterfeit Oxycodone "M30" pills suspected to contain fentanyl.

- 17 -

89.     On or around September 9, 2021, Seattle HSI met with Seattle Courier 1 and their source of supply ("Seattle Source of Supply 1") for a controlled drug transaction they had scheduled with the day before with them. Seattle Source of Supply 1 got into Seattle HSI's vehicle, HSI Seattle showed Seattle Source of Supply 1 a bag containing two bricks of cocaine, and Seattle Source of Supply 1 advised Seattle HSI that Seattle Courier 1 would take the product (i.e., the cocaine) and Seattle Source of Supply would take the money.

90.     Seattle HSI then entered Seattle Courier 1's vehicle and Seattle Courier 1 told Seattle HSI to take a bag that contained counterfeit Oxycodone "M30" pills suspected to contain fentanyl. Seattle HSI took the bag and placed it in Seattle HSI's vehicle.

91.     Seattle HSI then advised Seattle Source of Supply 1 that the money was in another vehicle parked nearby and led Seattle Source of Supply 1 to that vehicle.

92.     Seattle HSI then arrested Seattle Courier 1 and Seattle Source of Supply 1.

93.     Seattle HSI seized approximately 11.3 kilograms of counterfeit Oxycodone "M30" pills suspected to contain fentanyl. The U.S. Drug Administration's ("DEA") Western Laboratory ("DEA Lab") confirmed the presence of fentanyl in the items seized. The amounts of controlled substances seized were consistent with distribution amounts.

94.     Seattle Courier 1 consented to a search of his residence. There, Seattle HSI seized 893.3 grams of methamphetamine and 749 grams of heroin. The DEA Lab confirmed the presence of these controlled substances in the items seized. The amounts of controlled substances seized were consistent with distribution amounts. Seattle HSI also seized a scale, which Seattle Courier 1 stated was used to weigh drugs, and a money counting machine, which Seattle Courier 1 stated he had used to count drug proceeds.

**E.     Seizure of Controlled Substances from Courier in UC Money Pickup 6.**

95.     During UC Money Pickup 6 on or around June 28, 2021, in Phoenix, HSI and DEA Phoenix identified the courier ("Phoenix Courier 1") to whom they showed the series and who dropped off $150,000 after following him to a residence in the Phoenix area that matched the residence listed in the registration for the vehicle he was driving.

96.     On or around July 5, 2021, Mexico Money Broker 1 reached out to the UC and offered a money pickup contract of $200,000 in Phoenix, Arizona. The UC agreed to coordinate the pickup of bulk cash and lauder it in exchange for a fee.

97.     On July 16, 2021, the Hon. Michelle H. Burns, U.S. Magistrate Judge for the District of Arizona, issued search warrants for Phoenix Courier 1's residence (No. 21-228MB) and vehicle (No. 21-229MB) and ordered both to be executed within 14 days.

98.     That same day, HSI and DEA Phoenix conducted surveillance on Phoenix Courier 1's residence in anticipation of the money pickup that the UC had agreed to coordinate for Mexico Money Broker 1, which had been scheduled for later that day by an individual using the same telephone number that was used to schedule UC Money Pickup 6. HSI and DEA Phoenix saw Phoenix Courier 1 (who was identified based on photographs taken during UC Money Pickup 6) exit his residence with two brown paper bags and walk toward his vehicle. Phoenix Courier 1 told HSI and DEA Phoenix that there was $2,000 in the bags, which he was going to deposit. He further stated that the money was not his and could not provide the owner of the money. He consented to search of the bags, and HSI and DEA Phoenix seized rubber-banded stacks of $198,028.00 in U.S. currency.

99.     HSI and DEA Phoenix then executed the search warrant on his residence. HSI and DEA Phoenix seized approximately four brick-shaped packages of suspected cocaine (which field tested positive for cocaine) and approximately two burrito-shaped packages of suspected heroin (which field tested positive for heroin) for his residence. The amounts of controlled substances seized were consistent with distribution amounts.

F.     **Overview of BigBen1613 LLC DBA Corner Stone Group DBA Nektova**

100.     Accounts 1 and 2 are held in the name of BigBen1613 LLC DBA Corner Stone Group DBA Nektova, 512 NE 190th St, Miami, FL 33179-3919 ("BigBen1613").

101.     According to publicly available records from the Florida Department of State's Division of Corporations, "BigBen1613 L.L.C." was incorporated on or about

September 7, 2008, its current principal place of business and mailing address is 508 NE 190th St, Miami, Florida 33179, and its authorized person and manager is Winkler.

102.   According to publicly available records from the Small Business Administration Paycheck Protection Program, BigBen1613 is in the household appliances, electric housewares, and consumer electronics merchant wholesalers industry and sector.

103.   According to records obtained from Metropolitan, BigBen1613 is purportedly primarily engaged in the wholesale distribution of consumer electronics.

104.   According to records from the Federal Reserve Bank Fedwire Funds Transfer System, between April 1 and September 30, 2021, BigBen1613 received approximately 398 incoming wire transfers for a total value of approximately $46,542,524.16. These records further show that approximately 37 individuals or entities sent these funds.

105.   One of these entities was the UC Company. The UC Company had no contact with BigBen1613 regarding the nature of its business or the services it provided. Nevertheless, BigBen1613 received at least 10 wire transfers totaling approximately $1,176,247.87 from on or about April 14, 2021, through on or about August 24, 2021.

106.   From January 1 to September 30, 2021, BigBen1613 received approximately 532 wire transfers for a total of approximately $60,080,285.30. Approximately 34.39% of this total amount originated outside of the United States, including approximately $17,274,587.46 from Mexico and approximately $3,388,259.23 from Paraguay.

107.   According to export data from the Automated Export System ("AES"), from January 1 to September 30, 2021, BigBen1613 exported approximately $5,964,734 of goods exclusively to Paraguay and none to Mexico—notwithstanding the approximately $17,274,587.46 it received in wire transfers from Mexico—or any other country.

G.   **Summary of Mexico Money Broker 1's Coordination of UC Money Pickups 1 to 10 and BigBen1613's Receipt of Wire Transfers of the Bulk Cash Picked Up**

108.   For UC Money Pickups 1 to 10, Mexico Money Broker 1 directed the UC to wire the bulk cash picked up to Account 1. In total, Mexico Money Broker 1 directed

approximately $1,176,247.87 to be wired into Account 1.  Nearly all of these funds were wired from Account 1 to Account 2 the same day they were deposited in Account 1.

109.    In three of these instances, after agreeing to payout funds the UC had picked up on behalf of another money broker in exchange for a fee paid to Mexico Money Broker 1, they directed the UC to wire a portion of the funds to Account 1. The total amount of the funds less the UC's and Mexico Money Broker 1's fees was paid out in Mexico.

110.    At the time funds were wired to Accounts 1 and 2, there were additional funds in the accounts with which the bulk cash was comingled (except for one instance in which there were no additional funds in Account 1). Comingling of tainted and untainted funds in business bank accounts disguises the nature and source of the tainted funds.

111.    UC Money Pickups 1-10 constituted operation of money transmitting businesses by Mexico Money Brokers 1 and BigBen1613 in Arizona, Illinois, New York, North Carolina, Florida, Texas, Washington, and Wyoming:

    a.    the pickup of bulk cash from third parties located in Arizona (UC Money Pickups 1, 6-9), Illinois (UC Money Pickups 3 and 5), Texas (UC Money Pickup 10), and Washington (UC Money Pickups 2 and 4);

    b.    the deposit of that cash into an undercover account at a North Carolina-based, federally chartered bank (Bank of America, N.A.) held by an undercover Wyoming-based limited liability company (UC Company);

    c.    the domestic wire transfer of that money to an account (Account 1) at a New York-based and New York-chartered bank (Metropolitan Commercial Bank) held by a Florida-based limited liability company (BigBen1613); and

    d.    the same-day internal transfer of those funds to another account at the same bank held in the name of the same company (Account 2).

112.    According to FinCEN records and publicly available state government databases, neither Mexico Money Brokers 1 nor BigBen1613 are licensed federally to conduct a money transmitting business in the United States nor in any of the states in which

1   they are located or have been operating, including Arizona, Illinois, New York, North

2   Carolina, Florida, Texas, Washington, or Wyoming. Moreover, Mexico Money Broker 1

3   and BigBen1613 had been in business and/or operating for more than 180 days.

4       113.   Based on the communications between the UC and Mexico Money Broker

5   1; the amounts of bulk cash that Mexico Money Broker 1 arranged for the UC to pick up

6   in various locations throughout the United States; the methods used for the pickups,

7   including coded language to facilitate the pickups and drop-offs and serial numbers on

8   currency to verify the identity of couriers receiving the funds; the number and locations of

9   the pickups; the follow-up communications between the UC's "associates" (i.e., local law

10  enforcement) and the couriers who conducted the drop-offs on behalf of Mexico Money

11  Broker 1 and their client(s), and the seizures of controlled substances (as that term is

12  defined in 21 U.S.C. § 802(6))  from couriers who conducted the money drop-offs, the

13  money was proceeds (as that term is defined in 18 U.S.C. § 1956(c)(9)) from dealing in

14  controlled substances—a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A).

15      114.   In addition, based on the UC and Mexico Money Broker 1's agreement that

16  the UC was going to deposit the bulk cash the UC picked up into a business bank account

17  in the United States, wire it to at least one additional business bank account in the United

18  States before it is ultimately paid out in cash to Mexico Money Broker 1's or other money

19  brokers' client(s) in Mexico, Mexico Money Broker 1 and other money brokers, their

20  client(s), the couriers, the holders of Accounts 1 and 2, and others are conducting these

21  money pickups in whole or in part to conceal or disguise the nature, location, source,

22  ownership, and control of their criminal proceeds and promote drug trafficking activities.

## FIRST CLAIM FOR RELIEF

23

24      115.   The United States incorporates by reference Paragraphs 1 through 114.

25      116.   The Defendant Property is property involved in a transaction or attempted

26  transaction in violation of 18 U.S.C. §§ 1956 and 1960, or any property traceable to such

27  property, the transactions involved proceeds (as that term is defined in 18 U.S.C.

28

- 22 -

1 § 1956(c)(9)) from dealing in controlled substances (as that phrase is defined in 21 U.S.C.

2 § 802(6))—a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(A)—and were

3 designed in whole or in part to conceal or disguise the nature, location, source, ownership,

4 and control of the proceeds and/or intended to promote drug trafficking, and is therefore

5 subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 984 and 28 U.S.C. § 2461.

6                                    **PRAYER FOR RELIEF**

7         WHEREFORE, the United States prays that process issue for an arrest warrant *in*

8 *rem* for the arrest of the Defendant Property; that due notice be given to all parties to appear

9 and show cause why the forfeiture should not be decreed; that judgment be entered

10 declaring the Defendant Property be forfeited to the United States for disposition according

11 to law; and that the United States be granted such other and further relief as this Court

12 deems just and proper, together with the costs and disbursement of this action.

13         Respectfully submitted this 13th day of April 2022.

14                                          GARY M. RESTAINO
                                           United States Attorney
15                                          District of Arizona

16                                          */s/ Bruce R. Van Baren*
                                           MARIA R. GUTIERREZ
17                                          MARK J. WENKER
                                           BRUCE R. VAN BAREN
18                                          Assistant U.S. Attorneys

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Roberto P. Lucchesi, verify and declare under penalty of perjury that I am a Special Agent with Homeland Security Investigations ("HSI"), I have read the foregoing Complaint for Forfeiture *In Rem* ("Complaint"), and I know that the matters contained in the Complaint are true based on my own knowledge, except those matters alleged upon information and belief, and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States of America, information supplied to me by other law enforcement officers, and my investigation of this case to date.

I, pursuant to 28 U.S.C. § 1746, verify and declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of April 2022.

*Roberto Lucchesi*

Roberto P. Lucchesi, Special Agent
Homeland Security Investigations

- 24 -